THE PEOPLE *ex rel.* NEIL F. HARTIGAN *et al.*, Petitioners, v. THE ILLINOIS COMMERCE COMMISSION, Respondent (The People *ex rel.* Neil F. Hartigan, Attorney General of the State of Illinois, *et al.*, Plaintiffs-Appellees; The Illinois Commerce Commission *et al.*, Defendants-Appellants).

First District (4th Division) Nos. 1—89—2775, 1—89—2807, 1—89—2808, 1—89—2966, 1—89—3166, 1—89—3481 cons.

Opinion filed June 7, 1990.—Modified on denial of rehearing October 18, 1990.

918

920

Neil F. Hartigan, Attorney General, of Springfield (G. Darryl Reed, MaryNic U. Foster, and Robert W. Cushing, Assistant Attorneys General, of Chicago, of counsel), for the People.

Neil F. Hartigan, Attorney General, of Springfield (Clyde Kurlander and Edward P. O'Brien, Special Assistant Attorneys General, of Chicago, of counsel), for Illinois Commerce Commission.

Cecil A. Partee, State's Attorney, of Chicago (Thomas H. Rowland, Assistant State's Attorney, of counsel), for People of Cook County *ex rel.* Cecil A. Partee.

Stephen J. Moore and Stephen Fogel, both of Office of Public Counsel, of Chicago, for People of State of Illinois *ex rel.* Office of Public Counsel.

Kelly R. Welsh, Corporation Counsel, and Foley & Lardner, both of Chi-

cago (Patrick Giordano, of counsel), for City of Chicago.

Governor's Office of Consumer Services, of Chicago (David Gilbert and Patricia O'Brien, of counsel), for Governor's Office of Consumer Services.

John P. Meyer, of Danville, for Illinois Department of Transportation.

Howard A. Learner and Robert L. Jones, Jr., both of Chicago, for Business and Professional People for the Public Interest.

Jenner & Block, of Chicago (Robert L. Graham and Norman M. Hirsch, of counsel), for Citizens Utility Board.

Legal Assistance Foundation of Chicago (Allen W. Cherry, of counsel), for Community Action for Fair Utility Practice, National Peoples Action, and South Austin Coalition Community Council.

Cornfield & Feldman, of Chicago (Gilbert A. Cornfield and Daniel Koen, of counsel), for Labor Coalition on Public Utilities.

Randall Robertson, of Lueders, Robertson & Konzen, of Granite City, and Paul J. Maton, of Chicago, for Illinois Industrial Energy Consumers.

Howard J. Trienens, R. Eden Martin, Michael I. Miller, and Dale E. Thomas, all of Sidley & Austin, and Kevin M. Forde, of Kevin M. Forde, Ltd., both of Chicago, for Commonwealth Edison Company.

JUSTICE JIGANTI delivered the opinion of the court:

I. NATURE OF THE CASE

This is the second time this case has been before the Illinois courts. In October of 1985, the Illinois Commerce Commission (hereinafter the Commission) issued a decision allowing Commonwealth Edison Company (hereinafter Edison) an increase in rates of approximately $495 million annually. The bases of the rate increase were the costs Edison incurred in constructing the Byron Unit I nuclear generating station. Of the $2.55 billion in costs Edison submitted for inclusion in the rate base, the Commission found $101.5 million to be unreasonable and therefore disallowed. Costs deemed unreasonable cannot be included in the rate base. The rate increase of $495 million annually reflected those costs the Commission found to be reasonable and therefore subject to recovery through increased rates.

Several consumer groups and government agencies appealed the Commission's rate order to the circuit court of Cook County. On April 29, 1986, the circuit court reversed the Commission's rate order. The circuit court ordered the Commission to remove all Byron I costs from Edison's rate base and to "roll back" Edison's rates to preexisting levels within 30 days of the circuit court order. On May 16, 1986, the circuit court granted Edison's motion to stay the effect of the April 29, 1986, order pending further judicial review. The stay order allowed Edison to continue to collect the Commission-approved October 1985 rate increase subject to refund. The circuit court also included in the stay order a provision stating that the circuit court retained jurisdiction to "determine and administer" any refund resulting from a new Commission determination on remand.

The consumer and governmental parties petitioned for leave to appeal directly to the Illinois Supreme Court. The supreme court granted the petition and issued its opinion in *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865. In *Hartigan*, the supreme court reversed in part and affirmed in part the circuit court's April 1986 order. The supreme court remanded the case to the Commission with instructions to conduct further ratemaking proceedings consistent with the supreme court's decision.

On remand the Commission conducted further evidentiary proceedings and determined that more of the costs incurred in constructing Byron I were unreasonable than the Commission had determined in 1985. The Commission disallowed as unreasonable $291.1 million of the total $2.55 billion construction cost of Byron I. To account for the additional rate-base reduction, the Commission determined that Edison must reduce its prospective rates beginning in 1990. The Commission also determined that Edison must refund to customers an amount representing the difference between the rates as charged between April 30, 1986, and December 31, 1989, and the rates that Edison should have charged given the proper disallowance for unreasonable costs. The Commission issued its findings in a final order on remand, issued August 23, 1989, and a supplemental order on remand, issued September 5, 1989.

While the appeal of the Commission's October 1985 rate order was pending before the circuit court, the judicial review provision of the Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 10–201) was amended to remove review of Commission orders from the circuit court and vest review in the appellate court effective January 1, 1986. A question remained as to whether jurisdiction to review the Commission's order on remand and supplemental order on remand lay in this

court or was reserved to the circuit court under the savings clause of the Public Utilities Act. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 4—402.) Due to this uncertainty, Edison filed petitions for review of the Commission's orders in both the circuit court and this court. Later, the circuit court, relying on the Second District Appellate Court's decision in *Independent Voters v. Illinois Commerce Comm'n* (1989), 189 Ill. App. 3d 761, 545 N.E.2d 557, *appeal denied* (1990), 129 Ill. 2d 563, 550 N.E.2d 556, ruled that the circuit court lacked jurisdiction to review the Commission's remand orders and dismissed Edison's petition for review. These remand orders are the subject of consolidated appeals before this court. The parties to this appeal are as follows: Commonwealth Edison, Illinois Commerce Commission, a group of 11 consumer and governmental groups that we will refer to collectively as the Joint Intervenors, Illinois Industrial Energy Consumers (IIEC), and the People of the State of Illinois (the Attorney General). Where appropriate, the Joint Intervenors, the IIEC, and the Attorney General will be referred to collectively as the Intervenors.

On appeal Edison argues that in determining unreasonable costs, the Commission engaged in arbitrary and capricious decision making, unsupported by the evidence. Edison also questions aspects of the Commission's directives related to the computation of the refund. The consumer and governmental intervenors also agree that in several key respects the Commission's findings are arbitrary and not supported by the evidence. Unlike Edison, however, these petitioners contend that the Commission should have found more Byron I cost overruns and schedule delays unreasonable than it did. Edison also appeals from a series of orders issued by the circuit court in October of 1989 relating to the appropriate interest rate and method of administrating the refund. Finally, the Commission appeals the circuit court's ruling that it retains jurisdiction over the implementation and administration of the refund.

II. STATEMENT OF FACTS

THE CONSTRUCTION AND LICENSING OF BYRON I

Edison began construction of the Byron I nuclear generating plant in 1975. The actual construction took longer and cost more than was originally estimated. Edison constructed Byron I in 113 months, at a total cost of $2.55 billion and loaded fuel on November 2, 1984.

Before Edison could load fuel in Byron I and begin operation, it had to obtain an operating license from the Atomic Safety and Licensing Board (hereinafter the Licensing Board), an administrative arm of

the Nuclear Regulatory Commission (NRC). Before issuing an operating license, the Licensing Board must be reasonably assured that operation of the plant will be consistent with protection of the public health, safety, and environment. Members of the public may initiate proceedings before the Licensing Board to raise safety-related questions pertaining to the nuclear plant. Once these hearings are concluded, the Licensing Board determines whether to grant the utility an operating license.

The relevant portion of the licensing proceedings for Byron I began in June of 1982, when the Licensing Board allowed the Rockford League of Women Voters to raise its opposition to the licensing of Byron I. The licensing proceedings concluded in January of 1984, after the Licensing Board conducted hearings pursuant to proceedings reopened in June of 1983 to allow Byron I workers to assert challenges. On January 13, 1984, the Licensing Board issued an opinion denying Edison a license to load fuel and begin operation of Byron I.

In denying a license to Edison, the Licensing Board noted that "the most important" aspect of its decision related to failures in Edison's quality assurance program. A quality assurance/quality control program is a primary means by which a utility oversees the activities of its site contractors and vendors. On June 24, 1982, the NRC formally notified Edison of deficiencies in its quality assurance program. In response, Edison implemented a reinspection program which commenced in March of 1983. In October of 1983, Edison submitted a preliminary report to the NRC on the reinspection proceedings. Further reinspections were conducted at the request of the NRC, and on January 12, 1984, Edison submitted its final report. During the time Edison was conducting the reinspection program, the Licensing Board was conducting the regulatory proceedings described above. Edison's final reinspection report did not reach the NRC until January 12, 1984. Consequently, the report was not considered by the Licensing Board when it issued its decision on January 13, 1984, denying Edison an operating license.

In May of 1984, in response to Edison's appeal of the Licensing Board's denial of an operating license, the appeals board of the NRC remanded the proceeding to the Licensing Board for further evidentiary hearings on the issue of quality assurance. The Licensing Board concluded its remanded proceedings in October of 1984. Edison received an operating license on October 31, 1984, and loaded fuel on November 2, 1984.

## THE COMMISSION'S OCTOBER 1985 RATE ORDER

The Commission proceedings leading to the orders now under review began in 1984 when Edison proposed a general increase in electric rates to reflect the costs of building Byron I. Edison sought the rate increase under the Public Utilities Act, section 9—213. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—213 (formerly Ill. Rev. Stat., 1985 Supp., ch. 111²/₃, par. 30.1).) Under section 9—213, the Commission may include in the rate base only those construction costs it determines to be reasonable.

As a prelude to determining the allowable costs to be included in the rate base, the Commission hired the accounting firm of Arthur D. Little, Inc., to conduct an audit of the costs and schedule of Byron I. Based on the audit and other evidence, the Commission entered a rate order in October of 1985, allowing Edison a $494.8 million annual rate increase. In doing so, the Commission disallowed $101.5 million of Byron I construction costs as unreasonable. For a history of the Commission's proceedings leading to the October 1985 rate decision, see *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865.

## THE CIRCUIT COURT REVIEW

Several parties to the October 1985 rate decision appealed to the circuit court of Cook County. On April 29, 1986, the circuit court issued a decision reversing the Commission's order. Included in the circuit court's grounds for reversal was a finding that the Commission had violated then section 30.1 of the Public Utilities Act (see Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—213) in presuming, instead of requiring an affirmative demonstration, that the costs of Byron I were reasonable. The circuit court ordered the Commission to "roll back" the entire rate increase.

Edison filed a motion to stay the effect of the circuit court's "roll back" order pending appeal. The circuit court granted the motion to stay pursuant to Supreme Court Rule 305(b) (107 Ill. 2d R. 305(b)). The circuit court's stay order, issued on May 16, 1986, allowed Edison to continue charging the October 1985 rates, subject to refund if the Commission later determined a greater amount of Byron I costs should be disallowed from the rate base. In the May 16, 1986, order the circuit court also stated that the circuit court retained jurisdiction to "determine and administer" any refund resulting from a new Commission determination. The stay order provided that should a refund be appropriate, Edison should pay the refund as promptly as possible to its historical rather than current customers, at an interest rate that

the circuit court would later calculate pursuant to its retained jurisdiction.

## THE ILLINOIS SUPREME COURT REVIEW

The Illinois Supreme Court accepted a direct appeal of the circuit court's roll-back order, and in June of 1987 reversed the order in part, and remanded the case to the Commission to conduct further rate-making proceedings. (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865.) The supreme court found that the Commission had erred in presuming that Edison's costs were reasonable. The supreme court also determined that while the circuit court was without authority to order the Commission to roll back Edison's rates, subjecting Edison to a possible refund of rates was an "allowable" remedy. *Hartigan*, 117 Ill. 2d at 148, 510 N.E.2d at 877.

The Illinois Supreme Court reversed the Commission's October 1985 Byron I rate order based upon the court's conclusion that the Commission must be satisfied through affirmative evidence that Edison's costs are reasonable before they may be included in the rate base. (*Hartigan*, 117 Ill. 2d at 147, 510 N.E.2d at 877.) The supreme court remanded the appeal to the Commission for a determination of the allowable rates in accordance with the supreme court's decision. The court instructed the Commission to base its findings on the existing record and any other evidence the Commission in its discretion determined should be considered. *Hartigan*, 117 Ill. 2d at 141, 510 N.E.2d at 874.

In a simultaneously issued opinion, the supreme court held that if upon completion of the appellate process a reversal of a Commission order is upheld in whole or in part, any refund exists from the time when the order is first reversed until such time as the Commission issues a new rate on remand. (*Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 510 N.E.2d 850.) In the present case, the refund dates from the circuit court's April 1986 reversal of the Commission's October 1985 rate order to December of 1989. The amount of the refund is to be comprised of the difference between the invalidated rates and those which would have been charged had the rates been set in accordance with the court's final appellate decision. The refund remedy created in *Independent Voters* was made expressly applicable to the *Hartigan* decision. *Hartigan*, 117 Ill. 2d at 148, 510 N.E.2d at 877.

## THE AUDIT ON REMAND

On remand, the Commission retained a different accounting firm,

Arthur Young & Company, to conduct a new audit of Byron I plant costs. The Arthur Young audit report consists of 5 volumes of 17 technical chapters, and is supported by 3,132 footnotes. That the Arthur Young audit was conducted in a manner consistent with generally accepted auditing standards has not been questioned on appeal.

As a starting point, the auditor began with Edison's own January 15, 1977, construction schedule. According to Edison, Byron I was to have been completed in 64.9 months. Actual construction took 113.6 months, or 48.7 months longer than planned in January of 1977. To identify the causes for delay, the auditors pinpointed five major construction periods, or milestones, considered to be along the "critical path" of the plant's construction. Milestones represent those activities from initiation to completion which take the longest amount of time to complete and therefore determine the actual duration of the project.

Arthur Young found that in the first milestone period, first concrete to nuclear steam supply system (NSSS) set, 8.5 months of delay occurred due to the late installation of the steam generator lower lateral (SGLL) support steel. The auditor determined that this delay was the result of weld-cracking problems, and that Edison's response to the problems was reasonable. Consequently, the auditors concluded that the 8.5-month delay in the first milestone period was not unreasonable.

The second milestone period, NSSS set to hydrostatic testing (Hydro), was concluded 12.1 months later than planned. Arthur Young determined that 2.1 months of this delay were due to Edison's continuing quality assurance problems with Hatfield Electric Company and was unreasonable. The auditor further determined that 2.4 months of the delay were attributable to late engineering releases of piping and hangers. The auditor considered this 2.4-month delay and the remaining 7.6 months of delay comprising the balance of delay in the second milestone period to be reasonable.

Arthur Young found an 11.8-month delay in the third milestone period, Hydro to hot functional testing (HFT). The auditor concluded that 8.0 months of the delay occurred as a result of the impact on the nuclear power industry of the 1979 Three Mile Island accident, and 3.8 months of the delay were due to various internal delays at Edison. Arthur Young concluded that the full 11.8-month delay was reasonable.

In the fourth milestone period, spanning the time between hot functional testing and fuel load, the auditor found 15.5 months of delay. Arthur Young determined 1.7 months of the delay to be reasonable. The remaining 13.8 months of delay the auditor attributed to overlapping delays of the following duration: 11.4 months due to Edison's tardy response to fire-protection issues; 11.6 months due to delays in completion

of preoperational testing; and 9.6 months due to the Licensing Board's denial in January of 1984 of an operating license for Byron I. Arthur Young determined each of these delays to be unreasonable.

Finally, in the fifth milestone period, fuel load to commercial operation, Arthur Young determined that an 0.8-month delay was reasonable.

The auditor concluded that the total unreasonable delay in the construction of Byron I amounted to the following 15.9 months: 2.1 months of delay in the second milestone period; and 13.8 months of delay in the fourth milestone period. Deducting the total amount of unreasonable delay from the November 2, 1984, fuel load date of the as-built Byron I, the auditor determined that the "mitigated" reasonable fuel load date for Byron I was July 7, 1983.

Arthur Young calculated the cost of the 15.9-month delay as $91.8 million. To arrive at this figure, the auditors used the present value revenue requirements (PVRR) method of quantification. The PVRR method compares the PVRR associated with the plant as installed with the PVRR associated with the plant had it been installed earlier. Theoretically, the PVRR approach is intended to place ratepayers in the same position they would have been in had the project been built according to the cost and schedule determined reasonable.

In addition to calculating the unreasonable delay cost, Arthur Young found Edison had incurred $32 million in unnecessary direct costs during the construction of Byron I. Included in the auditor's definition of direct costs were amounts spent for equipment, testing, craft labor, installation, including contractor costs, as well as the cost of stop work orders the NRC issued relating to deficiencies in cable pulling and the safety-related quality assurance program. Arthur Young also included in this category those costs indirectly related to or a consequence of specific events or issues. The auditor attributed another $10 million in unreasonable costs to the AFUDC (allowance for funds used during construction) related to the unreasonable direct costs. AFUDC costs represent the costs of financing or carrying the expenses incurred during construction until such time as the utility's investment in the project enters the rate base. The auditor found total direct costs plus related AFUDC of $42 million.

### THE ORDERS ON REMAND

On remand, the Commission held procedural and evidentiary hearings during which it considered the Arthur Young audit report and other evidence the interested parties presented. On August 23, 1989, the Commission issued its 272-page order on remand. The Commission agreed with Arthur Young's conclusion that Edison was responsible for

15.9 months of unreasonable delay in the construction of Byron I. However, the Commission did not adopt Arthur Young's proposed PVRR method of quantifying the cost of the delay. The Commission instead used the end-of-period AFUDC method in calculating the delay cost. The end-of-period AFUDC method does not attempt to allocate the cost of the delay to the specific period in which it occurs. Under the end-of-period AFUDC method, the AFUDC that accrues beyond the date on which the plant would have been completed, had no unreasonable delay occurred, is considered the cost of the delay. In the present case, the Commission calculated the AFUDC for the last 15.9 months of Byron I's construction. The Commission considered the resulting figure, $289.6 million, as the cost of delay.

As for the direct unreasonable costs of construction, the Commission agreed with Arthur Young's conclusion with one exception. The Commission did not agree with the auditor's disallowance of $9.7 million, including related AFUDC, attributable to Edison's installation of loop isolation valves. The Commission found the cost of installing the valves to be reasonable. The Commission disallowed a total of $32.3 million in direct costs and related AFUDC.

The Commission also found that the total actual cost of constructing the Byron I unit exceeded the earlier estimates used in the October 1985 order by $30.8 million. The Commission increased the allowable costs by this amount. In sum, the Commission determined that a net $291.1 million in construction costs could not be allowed in Edison's rate base.

| Delay Costs | ($289.6 million) |
| Direct costs & AFUDC | ($ 32.3 million) |
| Increase in plant costs | $ 30.8 million |
| Disallowed as Unreasonable | ($291.1 million) |

In its October 1985 order, the Commission had concluded that $101.5 million in construction costs were unreasonable and therefore disallowed from the rate base. The net reduction in the rate base as a result of the Commission's decision on remand is to reduce Edison's rate base by an additional $189.6 million.

$291.1 million
($101.5 million)
$189.6 million

On appeal, Edison asserts that the auditor's and the Commission's conclusion that Edison was responsible for 15.9 months of unreasonable delay is not supported by the record. The governmental and consumer petitioners, on the other hand, argue that the record supports a finding

that Edison was responsible for a greater amount of unreasonable delay and direct costs than the Commission has accounted for. The governmental and consumer petitioners also assert that the Commission has incorrectly applied the AFUDC end-of-period quantification method in calculating the delay cost.

## THE REFUND

The following two financial consequences flow from the Commission's orders on remand: a prospective decrease in Edison's rates; and a refund to customers of the difference in the rates as charged under the October 1985 rate order and the rates that properly should have been charged. On September 19, 1989, the Commission issued a supplemental order on remand. In the supplemental order, the Commission determined that under the modified rate order, Edison is required to refund to its customers $196.6 million. This figure includes interest at 5% compounded annually for the period from April 29, 1986, the date the circuit court reversed the Commission's October 1985 order, through December 1989. In the supplemental order, the Commission specified that Edison make the refund to its current rather than its historical customers, and outlined a methodology for the payment of the refund. The refund was to have commenced in November of 1989. Implementation of the refund was stayed pending the outcome of this appeal.

The Commission reserved for rehearing the question of whether Edison should be required to make the refund based on the actual amounts collected under the prior rates, or whether the refund should be based upon the rates as projected in the October 1985 order. A rehearing before the Commission never came about due to operation of law. The Commission was unable to obtain the four out of five votes necessary to specifically grant or deny the petition for rehearing. As a consequence, the issue of actual or projected revenues is before us on appeal.

The rates the Commission prescribed in October 1985 were replaced effective January 1, 1989, by different rates approved by the Commission in a sixth interim order issued in December of 1988. The sixth interim order provided for a $235 million increase in Edison's rates for 1989. The rate order was promulgated in response to Edison's request for an increase in rates to cover the costs of bringing Byron II and Braidwoods I and II nuclear generating plants into service. In an opinion filed in May of 1990, the Illinois Supreme Court reversed the Commission's sixth interim order and ordered Edison to refund revenues collected under the 1989 rate increase. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192

(*BPI*).) The court concluded that the Commission had acted improperly in basing the new rates on a settlement to which the consumer and governmental parties had not agreed. The supreme court remanded the case to the Commission to determine in accordance with the court's opinion, the correct rates to be applied after January 1, 1989.

On appeal, Edison asserts that any refund for 1989, based on the Commission's remand orders of August and September 1989, cannot be calculated until the Commission on remand, pursuant to the supreme court's decision in *BPI v. Illinois Commerce Comm'n*, has determined the proper rates for 1989.

### THE CIRCUIT COURT'S REFUND ORDER

Contemporaneous with the Commission's issuance of the remand order of August 1989, and supplemental remand order of September 1989, the circuit court of Cook County received briefs and arguments concerning the circuit court's jurisdiction over the refund process. The circuit court also entertained arguments related to the principal amount of the refund, the appropriate interest rate, and the method of implementing the refund.

On October 12, 1989, the circuit court issued a jurisdictional statement, ruling that it had retained continuing jurisdiction over the refund process through an express provision in the May 16, 1986, stay order which the circuit court issued pursuant to Supreme Court Rule 305(b) (107 Ill. 2d R. 305(b)). The circuit court pointed out that none of the parties to the May 16 order had appealed the ruling, and the supreme court in *Hartigan* had endorsed the refund order as "allowable." The circuit court characterized its jurisdiction over the refund process as judicially conferred and not statutorily based.

Pursuant to its finding that the circuit court's determination and administration of the refund superseded the Commission's contrary directives in the supplemental order on remand, the circuit court proceeded to issue a series of directives relating to the refund. The circuit court ruled that the proper amount of the refund for the period April 30, 1986, through December 31, 1989, is approximately $244 million. This amount reflects the difference between the rates deemed proper by the Commission on remand and Edison's actual receipts. The sum also includes 9% interest compounded annually. Under the circuit court's direction, the refund is to be paid to historical rather than current customers and was to have commenced in March of 1990. This court has since stayed the effect of the circuit court's refund order pending the outcome of this appeal.

The circuit court's refund ruling was made final and appealable in

an order dated November 20, 1989. On appeal, the Illinois Commerce Commission contests the circuit court's assertion of continuing jurisdiction over the implementation and administration of the refund. Edison does not contest the circuit court's jurisdiction. Edison does argue, however, that the circuit court is bound by statute in determining the proper interest rate to be applied to the refund. Edison argues that the legal interest rate is 5% simple interest. The consumer and governmental petitioners maintain that the circuit court has retained jurisdiction over the refund process and, as such, the specific directives of the circuit court must be upheld. These petitioners further assert that regardless of the jurisdictional issue, the proper rate of interest is at least 9% compounded annually. The parties also differ over other details concerning the proper refund methodology to be applied.

### THE PROSPECTIVE RATE REDUCTION

As a result of its findings, the Commission concluded that beginning in 1990, Edison must reduce its rates by $43.2 million annually. The Commission originally intended the Byron I prospective rate decrease to be offset against any rate increase the Commission found to be just and reasonable for the years 1990 and beyond. Setting the prospective rates for the years 1990 and beyond was the second step of the rate-setting activity the Commission undertook in its sixth interim order, the order remanded by the Illinois Supreme Court in *BPI v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192. The Commission's intent was to provide a single net increase or decrease in Edison's rates beginning on January 1, 1990.

After the Illinois Supreme Court reversed the sixth interim order, the Commission issued a seventh interim order suspending all further proceedings and deferring all actions proposed for the second phase of the sixth order until further notice. On the same day the Commission issued the seventh order it also issued an eighth interim order, directing Edison to amend its rates effective January 1, 1990, to reflect the $43.2 million prospective decrease flowing from the Commission's remand orders. On January 3, 1990, this court stayed the effect of the Commission's eighth interim order pending Edison's appeal in case No. 1—89—3515. The prospective rate decrease issue is not a part of the instant appeal.

III. The Public Utilities Act

### SETTING UTILITY RATES

■■ ■ The setting of utility rates is a legislative rather than a ju-

dicial function. (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865.) The Illinois Commerce Commission and not the court is the fact-finding body in the rate-making scheme. The Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 1—101 *et seq.*) and the Illinois Administrative Procedure Act (IAPA) (Ill. Rev. Stat. 1987, ch. 127, par. 1001 *et seq.*) govern the Commission in its role as a rate-making body. The Public Utilities Act sets forth various findings the Commission must make before the Commission may approve a utility's proposed rates. (*BPI v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192.) Moreover, any finding, decision, or order the Commission makes must be based exclusively on the record for decision in the case. The record "shall include only the transcript of testimony and exhibits together with all papers and requests filed in the proceeding, including, in contested cases, the documents and information described in \*\*\* the [IAPA]." Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—103.

 The Public Utilities Act specifies that the goal of utility rate regulation is to ensure that reliable energy services are provided at the least possible cost to citizens while allowing utilities a sufficient return on investment. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 1—102(a).) To fulfill this duty, the Commission must ensure that no costs associated with the construction of a new electric utility generating plant are included in the rate base unless the costs are reasonable. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—213.) Section 9—213 of the statute defines reasonable costs as those costs associated with a utility's decisions, construction, and supervision, which "resulted in efficient, economical and timely construction." In determining the reasonableness of costs, the Commission is to consider "the knowledge and circumstances prevailing at the time of each relevant utility decision or action." Under the statute, an audit is the primary basis for the determination of which costs are reasonable. (*Hartigan*, 117 Ill. 2d at 133, 510 N.E.2d at 870.) Only when the audit report or other affirmative evidence satisfies the Commission that the construction-related costs are reasonable may those costs be included in the rate base. It is impermissible for the Commission to presume that such costs are reasonable. *Hartigan*, 117 Ill. 2d at 136, 510 N.E.2d at 871.

### JUDICIAL REVIEW

 While the Commission's interpretation of a question of law is not binding upon a court of review, the court is otherwise limited in its examination of the decisions of the Commission. (*Hartigan*, 117 Ill. 2d at 137, 510 N.E.2d at 874.) The Illinois Supreme Court has stated

that where the facts are controverted, and the decision depends on the credit to be given contradicted testimony, the orders of the Commission are entitled to great weight. (*Illinois Commerce Comm'n ex rel. Lumaghi Coal Co. v. Chicago & Eastern Illinois Ry. Co.* (1928), 332 Ill. 243, 163 N.E. 664.) Aside from evaluating whether the Commission acted within the scope of its authority or infringed upon a constitutional right, a court is limited to reviewing whether the Commission set out findings of fact supporting its decision and whether the findings are against the manifest weight of the evidence. (*Hartigan*, 117 Ill. 2d at 142, 510 N.E.2d at 874.) An order of the Commission is considered *prima facie* reasonable, and the burden of proof upon all issues is on the parties appealing from the order. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(d).) Moreover, the Public Utilities Act restricts the orders the reviewing court may enter. Under section 10—201(e)(iii), if the court finds that the Commission's order does not contain findings or analysis sufficient to allow an informed judicial review, the court "shall remand the rule *** in whole or in part, with instructions to the Commission to make the necessary findings or analysis." A reviewing court "shall reverse a Commission rule *** in whole or in part, if it finds that *** [t]he findings of the Commission are not supported by substantial evidence based on the entire record ***." (Ill. Rev. Stat. 1987, ch. 111⅔, pars. 10—201(e)(iii), (e)(iv)(A).) Upon reversal or remand, the Commission may then accept additional evidence, reevaluate the evidence already presented, or reverse its original determination. (*Hartigan*, 117 Ill. 2d at 143, 510 N.E.2d at 874.) The Commission's revised orders are also subject to review.

IV. ISSUES

### THE CONSEQUENCES OF THE LICENSING DELAY

A significant portion of the Byron I costs that the Commission has disallowed on remand emanates from the Commission's conclusion that the overall effect of the schedule delays the auditor found unreasonable was to defer the commencement of Byron I's operation by 15.9 months. One of the auditor's findings was that Edison, on notice from the NRC of deficiencies in its qualification/certification program, took six months longer than it should have in submitting an acceptable reinspection program to the NRC. Edison submitted its reinspection proposal for NRC approval in February of 1983. In the auditor's judgment, Edison should have developed its reinspection program by September of 1982. The auditor concluded that absent the six-month delay, the results of the reinspection program would reasonably have

been available by mid-July 1983. The Commission concluded that the consequence of Edison's tardiness was to delay the licensing proceedings for a period of 9.6 months. These 9.6 months represent the period between January 13, 1984, when the Licensing Board initially denied a license to Edison, and October 31, 1984, when, upon remand from the NRC appellate board, the Licensing Board granted a license to Edison.

The auditor reported that a key factor in the Licensing Board's initial decision to deny a license to Edison in January of 1984 was the fact that the NRC had been unable to evaluate Edison's reinspection program because Edison had not yet completed it. Edison submitted its final report on January 13, one day before the Licensing Board issued its initial opinion. The Commission accepted the auditor's conclusion that if the 9.6-month licensing delay and the other schedule delays found to be unreasonable had been avoided, Edison could have loaded fuel at Byron I on July 7, 1983, 15.9 months earlier than it did. Edison's primary argument on appeal revolves around this conclusion of the Commission.

In the remand proceedings, Edison argued to the Commission that even if it had submitted its reinspection proposal to the NRC in September of 1982, it could not have loaded fuel by July 7, 1983, because at that point the Licensing Board had yet to conclude licensing proceedings that the auditor concluded were reasonable. The Licensing Board did not reopen hearings in the Byron workers' intervention proceedings until June of 1983, and hearings began in August 1983, approximately three weeks after the mitigated fuel date of July 7, 1983. The initial licensing proceedings were not concluded until January 13, 1984, when the Licensing Board denied a license to Edison. Litigation of Edison's appeal took another 5½ months, from May to October of 1984, when Edison was granted a license. Edison asserted to the Commission and argues here on appeal that these facts preclude a finding that fuel could have been loaded on July 7, 1983. Edison calculates that when six months are removed from the actual fuel load date of November 2, 1984, the earliest fuel could have been loaded was in April of 1984.

Edison maintains that because the auditor found that any delays in the licensing proceedings, other than the extra six months Edison took to submit its reinspection program, were either reasonable or out of Edison's control, the auditor's mitigated fuel load date of July 7, 1983, is inconsistent with its own findings. Under Edison's theory, the Licensing Board's intervention hearings took place on a schedule independent of any activity for which Edison was responsible. Edison ar-

gues that the intervention proceedings served to mask or "trump" any concurrent Edison delay the auditor found to be unreasonable. Edison points out that masking is a policy that both the auditor and the Commission recognize.

On remand, the Commission found that on the issue of the licensing delay the arguments of staff were persuasive. The staff consists of employees of the Commission who engage in investigatory, prosecutorial, or advocacy functions for the Commission. The staff operates independently from the commissioners, hearing examiners, and other members of the Commission who render decisions. (See Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—106.) With respect to the issue of the licensing delay, the arguments that the staff asserted in the proceedings before the Commission are basically the arguments the Joint Intervenors and the Commission have submitted to us on appeal. The staff asserted before the Commission that there was no basis in the record for Edison's assumption that the time required for all of the events that occurred after the initiation of the reinspection program would have been the same if that program had begun earlier. In opposition to Edison's theory, the staff maintained that had the parties reached an earlier concurrence on the reinspection program, the actual duration of the performance of the reinspection and the litigation of its results would have been reduced. The auditor testified that this was a reasonable postulation.

For example, the staff cited testimony that indicated that if Edison had implemented the reinspection program earlier, the reinspections would have been completed before hot functional testing began, even if the duration of the reinspection program had remained the same. The effect of the hot functional testing occurring in the middle of the reinspection effort was to prevent inspectors from working in major portions of the containment building for many weeks. Further, staff argued that Edison could have shortened the duration of the reinspection through the application of more inspectors and resources.

Staff also argued that had the preliminary results of the reinspection program been available in January of 1983, as they would have been absent the six-month unreasonable delay, the Licensing Board may not have reopened the intervention proceedings in June of 1983. The record indicates that a key factor in the Licensing Board's decision to reopen the hearings was questions regarding the reinspection program. Staff concluded that had the results of the reinspection been available earlier, the Licensing Board would have at the very least avoided twice entertaining litigation over the reinspection issue.

Finally, the staff asserted that had the results of the reinspection

program been available earlier, the NRC could have and would have proceeded more expeditiously in concluding the licensing proceedings. The staff cited to testimony of an auditor representative who testified that in his experience the NRC labors not to be the instrumentality holding up the scheduled fuel load date. The staff summarized to the Commission that given these uncertainties regarding (1) when the reinspection program would have been completed had Edison begun it in a timely manner, (2) whether the Licensing Board would have reopened the evidentiary record and allowed the reinspection program to be litigated if the results of the reinspection had been available, and (3) what time periods actually would have been required to resolve the inspector qualification issue in front of the Licensing Board had the results of the reinspection been available, Edison had failed to demonstrate that fuel load would not have occurred in July of 1983.

On appeal, Edison argues, as it did in the proceedings before the Commission, that the "speed-up hypotheses" represented by the staff's arguments are speculative, unsupported in the record, and insufficient as a matter of law to support the Commission's schedule conclusions. The auditor testified before the Commission that it had not tried in conjunction with the audit to physically reschedule the reinspection or determine reasonable durations for each of the licensing events. Edison cites this testimony in support of its argument that the Commission's findings are based on "speculations."

Edison directs our attention to the evidence it presented to the Commission with regard to each of the considerations the staff advanced. Edison offered witness testimony to show that the reinspection program could not have been performed in less time unless Edison had stopped other critical construction activities. Edison argued to the Commission that if the reinspection program had been accelerated to meet a July 1983 fuel load date, the hot functional testing would necessarily have been accelerated as well. Edison concluded that the hot functional testing would have interfered with the reinspection program regardless of the six months' schedule delay. Edison argued that the auditors found and the Commission accepted that Edison's performance of the reinspection program was reasonable.

Edison also argued in the proceedings below that the NRC licensing litigation could not have been avoided. For support, Edison pointed out that when the Licensing Board denied Edison a license in January of 1984, the NRC had had the preliminary reinspection report since October of 1983. Following receipt of the preliminary report, the Licensing Board refused to delegate the issues involving the reinspection program to the NRC staff for informal resolution. Ac-

cording to Edison, this Licensing Board decision demonstrated that the board considered it critical to bring the reinspection issue to litigation. Edison concluded that there is therefore no basis for the assumption that had the NRC had the preliminary report earlier, the Licensing Board may have concluded that the reinspection issue need not be litigated, and would have refused to reopen the licensing hearings.

Edison further argued that the appeals board of the NRC had both the preliminary and the final reports in hand when it determined that the Intervenors had a right to litigate the important issue of the reinspection program, and consequently remanded the issue to the Licensing Board. Edison maintained that this decision also demonstrated that the NRC would not have avoided litigating the reinspection/quality assurance issue, even had Edison submitted its reinspection report earlier. Finally, Edison presented a former director of NRC licensing to attest that in his experience there is no reason to believe that the NRC review of the reinspection results would have been accelerated if the results had been available earlier. The witness testified that licensing proceedings are not predictable or controllable by the utility. Edison argued that factors related to the timing and duration of the licensing proceedings were out of Edison's control, a fact the auditor conceded, and the Commission adopted.

Summarizing its argument on appeal, Edison asserts that in light of the Commission's factual findings that Edison's conduct of the reinspection program and the licensing litigation were reasonable, the Commission's conclusion that Byron I should have been completed 15.9 months earlier is arbitrary and capricious, unsupported by the record and not adequately reasoned. Further, Edison argues that the Commission has unlawfully applied the reasonableness standard of section 9—213 of the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—213) in requiring Edison to respond to speculative scenarios of what might have been. Edison asserts that the Commission's formulation of Edison's burden of proof is erroneous in this regard.

After considering arguments and evidence, the Commission adopted the auditor's determination that the 9.6-month licensing delay was unreasonable. The Commission observed that there are problems with the NRC's regulatory procedures. The Commission reasoned, however, that it is not the Commission's position to determine whether a specific NRC decision or action is correct. The Commission determined that the controlling factor in the delay was Edison's response to the NRC's notice of deficiencies in the inspector qualification and reinspection program. In conclusion, the Commission adopted

the staff's position that Edison had failed to meet its burden of proving that fuel could not have been loaded by the auditor's mitigated date of July 1983.

In reaching its conclusion, the Commission acknowledged that the facts of the case were subject to the interpretation that each of the witnesses placed on the various documents, as well as the interpretation the parties placed on the testimony of the witnesses. Elsewhere in the remand order, in discussing the auditor's mitigated schedule analysis, the Commission recognizes that while attorneys may argue reasonable or logical inferences from evidence in the case, the inference or argument itself is not evidence. The Commission later states that its determination of the licensing issue is based not on speculation but on a review of the evidence.

 Edison asserts that the Commission is indulging in speculation when it assumes that other consequences flowed from Edison's six-month delay in submitting an acceptable reinspection program to the NRC. We believe, however, that the Commission understands the distinctions between speculation and inference. Logical inferences based on evidence are a permissible and integral part of legal reasoning. (See generally *Consolino v. Thompson* (1984), 127 Ill. App. 3d 31, 468 N.E.2d 422.) The Commission is in the best position to determine whether the evidence supports the argument or inference advanced.

 The Commission is qualified through experience and special study to evaluate the workings of the nuclear regulatory process. We must rely on the Commission's expertise in this regard. The Commission has determined that the licensing procedure would have proceeded differently had Edison made a timely response to the NRC. We believe that the Commission has made a fair inference, based on the record, and supported with a reasoned analysis.

### KEY FINDINGS OF REASONABLENESS

The Intervenors assert that several of the Commission's key findings of reasonableness in the remand order are arbitrary, not warranted by the evidence and contrary to principles of section 9—213 of the Public Utilities Act.

 The Joint Intervenors first present several general arguments in favor of reversing many of the Commission's key findings of reasonableness. Among these arguments is the assertion that the Commission's· "passive acceptance" of the auditor's findings is an abdication of its statutory duty. Further, the Joint Intervenors assert that the Commission's summary rejection of their challenges betrays an unfair hostility towards the Intervenors. We do not believe that ei-

ther of these arguments is dispositive of the issues at hand. It does not appear that the Commission accepted the auditor's position on every issue or rejected "every single one" of Joint Intervenors' challenges. Even if it has, however, the Joint Intervenors' assertion is not enough to support a claim of bias. (See, *e.g., People v. Taylor* (1984), 101 Ill. 2d 508, 518, 463 N.E.2d 705, 711; *People v. Vance* (1979), 76 Ill. 2d 171, 178, 390 N.E.2d 867, 870.) We are limited in our review to a determination of whether the Commission has drawn reasoned conclusions not against the manifest weight of the evidence and has set forth the facts forming the bases of its decisions. With this standard in mind, we turn to address the Intervenors' specific issues.

 (1) The Intervenors contend that the Commission should have considered unreasonable the 8.5-month delay in the first milestone period caused by Edison's failure to successfully weld the steam generator support (SGLLS) frames. Joint Intervenors presented expert testimony to the Commission demonstrating that Edison's inability to weld the SGLLS frames was unreasonable given the knowledge and circumstances prevailing at the time. Intervenors contend that it is not Edison's response to the unsuccessful welds that is at issue, but rather, the failure to weld successfully in the first place.

The auditor's conclusion, in which the Commission concurred, was that Edison's efforts to resolve the welding problems and its ultimate decision to switch to a bolted assembly were reasonable. The staff supported the auditor's findings, asserting that the Intervenors were attempting to impose a standard of perfection rather than a standard of reasonableness on Edison. Staff proposed that no project is free of problems regardless of how well it is managed. We do not believe there is any reason to disturb the Commission's finding on this issue. The fact that other such welding projects had been completed successfully is only one factor to be considered in determining if Edison's activity on this particular project was reasonable. We believe the Commission properly considered the evidence presented and has presented a reasoned analysis to support its conclusion.

 (2) The auditor found that Byron I construction was delayed for 2.4 months in the second milestone period because of "late engineering" due to a shortage of engineers at Byron I. The auditor attributed the increased need for skilled engineers during the construction of Byron I to unforeseen events such as changes in the NRC regulatory requirements. The auditor determined that Edison's decision to divert engineers to its lead project, La Salle, was reasonable. The auditor also cited an industry-wide shortage of materials for pipe hangers as a factor that contributed to the 2.4-month delay.

The Intervenors contested both the auditor's findings and the conclusions drawn from the findings. The Intervenors maintained that the auditor's findings supported a conclusion that the necessity of shifting engineers was due to Edison's poor judgment in deciding to construct six nuclear units at the same time. As we have stated, the Commission is in the best position to resolve disputes over the weight and credibility of evidence. Based on the findings of fact set forth in the remand order, we do not believe there is any reason for us to question the Commission's decision that the 2.4-month delay was reasonable.

■■ (3) The auditor determined that 3.8 months of internal delay in the third milestone period were due to multiple causes, some reasonable and some unreasonable. The auditor testified that absent the reasonable causes, the 3.8-month delay would have been considered unreasonable. The auditor concluded, however, that because the reasonable causes would have caused the same delay anyway, the 3.8-month delay was in effect reasonable. The Joint Intervenors argued that the predominant cause of the delay was Edison's unreasonably slow construction turnover rate. Intervenors urge us to review the evidence in light of their assertion that "the most probative" evidence refutes the auditor's conclusion that reasonable causes masked the unreasonable causes of delay. We do not believe it is our position to review the evidence to determine that which is the most probative. In light of the Commission's policy of allowing findings of reasonable delay to mask findings of concurrent unreasonable delay—a policy that the Intervenors do not challenge—we do not believe the Commission's conclusion is against the manifest weight of the evidence.

■■ (4) The Intervenors contend that $2.7 million in property and nuclear liability insurance costs have been impermissibly included in the cost of Byron I. The auditor found that this cost should have been allocated to Byron II. The auditor concluded, however, that from a materiality standpoint, the accounting reallocation was unnecessary. The Commission viewed the costs as common to both Byron I and Byron II units of the nuclear generating plant. The court in *Hartigan* has stated that whether all or part of the costs common to both plants should be charged as an expense of Byron I is a matter properly within the Commission's rate-making discretion. (*Hartigan*, 117 Ill. 2d at 146, 510 N.E.2d at 876.) The Commission found that Joint Intervenors had not offered any expert testimony to refute the auditor's professional accounting judgment. We do not believe there is reason for us to question the Commission's discretion in deciding this issue.

■■ (5) The auditor identified an 0.8-month delay that occurred

during the power ascension phase of the fifth milestone period and concluded this delay was reasonable. The auditor found a portion of this delay was due to events that Edison could have prevented. The Intervenors maintained that the auditor's finding that Edison could have prevented the events causing the delay was tantamount to a finding of unreasonableness as a matter of law under section 9—213 of the Public Utilities Act. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—213.) The Commission rejected the Intervenors' argument as hindsight analysis. The Commission found persuasive the auditor's conclusion that such delays were reasonable in view of the difficulties with similar units placed in service in the mideighties. The language of section 9—213 directs us to the "knowledge and circumstances prevailing at the time" of the relevant decision or action. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—213.) In view of this language, we do not believe that the reasonableness standard of the statute is as a matter of law synonymous with a standard based on that which could have been prevented. We believe that the Commission took the proper approach to this issue in its evaluation of the relevant evidence.

■■ (6) The Intervenors assert that the Commission arbitrarily allowed as reasonable the direct costs of the Byron nuclear licensing hearings. The auditor concluded that the six months Edison took to submit a reinspection program to the Licensing Board unreasonably delayed the Byron I project by 9.6 months in the fourth milestone period. The auditor did not find that Edison otherwise acted unreasonably in its response to and conduct of the licensing proceedings. The Intervenors cite to several criticisms the NRC licensing board leveled at Edison regarding its handling of the licensing proceedings. The Intervenors fault the Commission and the auditor for failing to consider these criticisms in their evaluation of Edison's performance. The Intervenors assert that the auditor has not made a specific finding as to Edison's conduct of the licensing proceedings and urges us to do so now.

The Commission concluded that absent a specific finding on the issue, the auditor's method of evaluation provided sufficient affirmative basis to support the auditor's testimony that the direct costs of the licensing proceedings were reasonable. The Commission concluded that the Intervenors had not successfully rebutted the affirmative evidence offered by the auditor and Edison. The Commission further found that in evaluating Edison's licensing conduct, the NRC had applied a different standard of review to a different record. Considering the evidence presented, we believe the Commission responded properly in reaching its conclusion.

■■ (7) In a similar argument to the one above, the Joint Intervenors asserted that the Commission arbitrarily allowed as reasonable the direct costs of the Byron I fire-protection measures. The auditor found that Edison's management of fire-protection issues unreasonably delayed the project by 11.4 months in the fourth milestone period. Based on the auditor's testimony, the Commission concluded that it was only the timing of the fire-protection measures that was unreasonable, and that the direct costs of fire protection were not increased by the delay in timing. The Intervenors presented witness testimony to the contrary. We believe the Commission's conclusion is not against the manifest weight of the evidence, is reasoned, and is supported by findings of fact.

■■ (8) The Commission rejected the auditor's recommendation that the $4.7 million in direct costs Edison incurred in installing reactor coolant loop isolation valves be disallowed from Edison's rate base as unreasonable. The Intervenors assert that in the face of substantial evidence to the contrary the Commission acted arbitrarily in reaching its conclusion. The Byron I facility has four loops containing coolant. In the event of a malfunction, the purpose of the coolant loops is to cool down the reactor, thus preventing an accident. The loop isolation valves are designed to isolate a malfunctioning loop, allowing the other three to continue functioning.

Operating with only three out of four coolant loops is referred to as operation in the N-1 mode. Operating in the N-1 mode requires a special license. In 1974, the NRC issued regulations requiring new studies to be performed by the utility, and approved by the NRC, before it would issue a license allowing plant operation in the N-1 mode. In the auditor's opinion, the changes in the NRC regulations should have triggered at Edison a reevaluation of its original decision to install coolant loop isolation valves at Byron, based on the lesser likelihood of receiving an N-1 operating license. The only cost-benefit analysis Edison conducted in relation to coolant loop isolation valves was undertaken in 1968 in conjunction with the installation of the valves at Edison's Zion nuclear plant. Edison installed the valves at Byron I, but never succeeded in receiving an N-1 license. In 1984, Edison ceased its efforts to obtain N-1 licensing.

The Commission concluded that Edison's decision was reasonable based upon two grounds. First, in 1974 Edison had no reason to doubt that the valves would eventually be used for N-1 operation. Secondly, a retroactive analysis based on facts known in 1974 has shown that loop isolation valves were perceived to be cost beneficial even in the absence of N-1 operation. The Intervenors assert that on the first

ground, the Commission's conclusion is flatly contradicted by the auditor's findings, and that the second ground is based on hindsight analysis. Neither of these arguments convinces us to overrule the Commission's decision. In weighing the evidence, the Commission may accept or reject the auditor's conclusions and testimony. Further, we believe that the Commission properly considered the retroactive analysis as evidence that under the prevailing knowledge and circumstances of the time, the decision to install the loop isolation valves was not unreasonable.

In addition to criticizing the Commission's findings on several key aspects of the construction, the Attorney General faults the Commission for failing to quantify unreasonable events that did not fall along the critical path. According to the Attorney General, the Commission has failed to account for events that did not specifically cause delay.

In the order on remand the Commission has explained the process the auditor took in evaluating the unreasonable costs related to Byron I. The Commission notes that in some instances work which was done would have had to have been done whether or not an unreasonable delay occurred. The associated direct costs were not found to be unreasonable. In other cases, the Commission explained, the unreasonable delay also caused unreasonable direct costs which would not have otherwise occurred. These direct costs were disallowed. Finally, certain unreasonable direct costs unrelated to delay were identified and disallowed.

We believe the auditor's process fully accounted for all the possible components of unreasonable costs related to Byron I. We further believe that the Commission's policy of allowing reasonable delay to mask unreasonable delay is a logical one.

The Attorney General also contends that the Commission erred in failing to evaluate shortcomings in project management in terms other than specific examples of impact on project functions. The auditor testified that weaknesses in general management philosophy do not produce costs unless and until they cause unreasonable expenditures or project delay. We believe the Commission could have accepted this explanation as a reasoned approach to the evaluation of managerial activity at Byron I.

### AFUDC METHODOLOGY

The auditor found that in constructing Byron I, Edison incurred unreasonable direct costs and unreasonable schedule delay costs. Direct costs are defined as those expenditures that are directly related, indirectly related, or a consequence of specific events or issues. Direct

costs may be considered activity related while schedule delay costs are time related. Direct costs also have a corresponding AFUDC impact. AFUDC represents the cost of carrying an expenditure once it is incurred, to the point when it is included in the rate base. There is controversy in this case, to be discussed later, over whether certain direct costs the Commission concluded were reasonable should have been considered unreasonable. However, the calculation of the dollar value of the direct costs is not in issue. The auditor calculated that the direct costs which should be disallowed as unreasonable are approximately $32.0 million with related AFUDC of approximately $10.0 million.

The proper method of quantifying or calculating the monetary cost of the 15.9 months of delay the auditor found to be unreasonable is a question in issue. More specifically, the Joint Intervenors contend that in quantifying the cost of the schedule delay, the Commission arbitrarily failed to include $80.6 million in time-related indirect costs in its calculations.

Before proceeding with a discussion of this issue, it will be helpful to understand a few of the concepts involved. As noted above, there are two types of costs that must be accounted for, activity-related costs and time-related or schedule costs. Both may be considered either unreasonable or reasonable. According to the auditor, activity-related costs include the direct, indirect, and consequential costs associated with a specific activity. Activity-related costs are static and therefore easily calculable. Time-related costs, on the other hand, increase with the passage of time and are affected by time-value-of-money concepts. A time- or schedule-delay cost is evaluated according to its relationship to a schedule in which no delay has occurred. Some of the factors associated with schedule-delay costs are *escalation costs*: the increased cost of labor and material expense due to the fact that an expenditure occurs later in time; *time-related indirect costs*: certain costs that increase with time, regardless of the level of construction activity occurring on the project. Time-related indirect costs include such costs as home-office overheads and on-site supervisory, administrative, and other costs; *AFUDC or Allowance for Funds Used During Construction*: the cost of carrying an expense until it can be included in the rate base. AFUDC represents the time value or cost of money. The costs described above are ever present on any project. The question is how much are these costs increased due to the schedule delay.

The auditor found that in constructing Byron I, Edison had incurred 15.9 months of unreasonable schedule delay. This means that

instead of entering the rate base in October of 1985, the cost of Byron I should have entered the rate base in June of 1984. The auditor's proposed method of quantifying the impact of the delay in terms of cost or rate-base adjustments was the present value revenue requirements (PVRR) method. The underlying theory of the PVRR method proposes to put the ratepayer in the position he would have been in had the utility been constructed without schedule delay. Under the PVRR method, the present value revenue requirements of the plant as installed are compared with the present value revenue requirements associated with the plant if installed earlier. As a first step, the auditor determines what the project cost would have been, absent the schedule delay and other unreasonable costs. To do this, the auditor initially removes the unreasonable direct or activity-related costs and the AFUDC associated with these costs from the as-built cost of the plant. Then, the auditor evaluates the cost impact of the project delays. The costs that occurred after the auditor's mitigated June 1984 date are shifted backwards in time and deflated to remove the effects of escalation and the time-related indirect costs due to the delay. The AFUDC is also adjusted to reflect an earlier completion date. In the present case, the auditor found that absent unreasonable direct costs and related AFUDC, and unreasonable delay costs, the cost of Byron I would have been approximately $2.1 billion. In the auditor's opinion, however, directly comparing this figure to the as-built $2.5 billion figure would improperly present the ratepayer with a June 1984 plant that he did not have to begin paying for until October of 1985.

To determine the proper adjustment to the rate base, the auditor used present-value analysis to assess the cost impact of the schedule delay in terms of benefit or harm to the ratepayer. For example, according to the auditor, as long as escalation rates do not exceed AFUDC rates, the ratepayer is not harmed because the benefit of the use of his money exceeds any additional escalation expense. Only when time-related indirect costs outweigh the benefit derived from the AFUDC rates exceeding escalation rates does real harm to the ratepayer occur. The net effect of the auditor's PVRR analysis was to employ present value of money analysis in assessing the historical and prospective impact of the schedule delay on the ratepayer in an attempt to place the ratepayer in the position he would have been in had no unreasonable delay or direct costs occurred. The auditor determined that the cost impact of the unreasonable schedule delay was approximately $92 million. The auditor added this figure to the $42 million in unreasonable direct costs and related AFUDC and determined

that the rate-base adjustment should be approximately $134 million or $169 million depending on the treatment of coal contract penalties.

The Commission rejected the auditor's proposed PVRR method of quantifying the impact of delay costs. The Commission reasoned that the PVRR method as applied in this case incorporated unreliable assumptions and judgment calls, particularly the shifting of certain costs to other time periods while not having sufficient reliable information to identify the corresponding effects on other activities or costs. Further, according to the Commission, the PVRR method as applied did not provide a reasonable determination of the time or period of time that should be adopted when recasting cash flows. The Commission's rejection of the PVRR methodology has not been brought into issue before this court. The controversy on appeal concerns the proper application of the method the Commission did adopt, the end-of-period AFUDC method.

The end-of-period AFUDC method was the Joint Intervenors' quantification method of choice in its arguments before the Commission. The end-of-period AFUDC method, as described by the Commission, is a straightforward method of calculating delay costs based upon the AFUDC which accrued beyond the date on which the plant would have been completed had no unreasonable delays occurred. In the present case, the Commission used the figures provided by the auditor in determining that the end-of-period AFUDC for the Byron I plant was $289.6 million. This calculation is based on the difference between the $876,196,000 of AFUDC for the as-built plant and the $583,140,000 of AFUDC the auditor calculated for a June of 1984 plant, less $3.8 million of AFUDC related to unreasonable direct costs. To the $289.6 million figure, the Commission added $32.3 million for what it considered to be unreasonable direct costs and related AFUDC, and deducted $30.8 million in "plant update" costs. Plant update costs represent the amount the total cost of constructing Byron I exceeded the earlier estimates used in the October 1985 order. In conclusion, the Commission determined $291.1 million to be the appropriate rate-base adjustment.

In arguments before the Commission, and here on appeal, the Joint Intervenors assert that in calculating the end-of-period AFUDC, the Commission arbitrarily failed to include $80.6 million in time-related indirect costs. This figure is derived from the $4.8 million a month of time-related indirect costs that the auditor determined to be due to the unreasonable delay. The Joint Intervenors contend that the end-of-period AFUDC method consists of the AFUDC accrued beyond the date on which the plant should have been completed, and all cash

costs including unreasonable direct costs and time-related indirect costs, plus their related AFUDC. The Joint Intervenors maintain that $80.6 million should be added to the Commission's finding of $291.1 million in disallowed costs for a total of $371.7 million.

The parties do not contend that the end-of-period AFUDC method measures the actual cost of time-related delay. Rather, AFUDC is one way of assessing the impact of schedule delay on a project without engaging in a complex analysis. Concededly, end-of-period AFUDC does not distinguish between AFUDC on reasonable or unreasonable expense, but merely measures the AFUDC for the last stage of construction regardless of the time in which the delay or cost occurred. In a conventional application of end-of-period AFUDC analysis, as explained by the auditor and a Joint Intervenors' witness, the rate of escalation, or increased expense, is considered to be equivalent to the rate of AFUDC, or cost of money. Up to the point of delay, escalation and AFUDC are considered to be a trade off. The AFUDC which accrues after the point of delay is used to represent increased costs to the consumer, as the rate at which AFUDC increases is considered to be the same rate by which expenses escalate. According to the audit report, if the ratepayer is called upon to meet expenses incurred due to delay without any traded benefit due to the cost of money, he is harmed. If in fact escalation rates are below AFUDC rates, employing the end-of-period AFUDC method overstates the harm to the ratepayer because he is experiencing some benefit from not having to pay for the increased expenses until a later date.

The controversy seems to boil down to whether one considers the actual rate of escalation to be lower than the rate of AFUDC. If that is the case, then the difference between the rates acts to absorb the delay costs, including time-related indirect costs, without having to actually calculate them. If one considers actual escalation rates to be equivalent to or greater than AFUDC rates, then using AFUDC to represent the delay costs falls short of accounting for all the costs associated with delay. Further, if time-related indirect costs are classified not as delay costs but as direct cash costs, as the Joint Intervenors argue they should be, the costs are not subsumed under any calculation for delay cost but are more appropriately included under direct costs due to construction failures. We believe the question of the appropriate rate of escalation and the classification of time-related indirect costs are controverted questions of fact that the Commission is in the best position to determine.

The Commission found that the end-of-period AFUDC method is a straightforward analysis of delay costs and applied AFUDC analysis

to calculate the delay costs in the present case. The Commission did not add a time-related indirect cost figure to its AFUDC calculation, reasoning that such a step suffered from the same subjectivity associated with shifting costs to other time periods while not having sufficient reliable information to identify the corresponding effects on other activities or costs.

■■■ The Commission also reasoned that section 9—213 gives it the ability to balance competing interests in selecting a delay quantification methodology. In the present case, the auditor and staff proposed a rate disallowance of $133 to $168 million, while the Joint Intervenors argued for a disallowance of at least $409 million. We believe that the Commission effectively balanced competing interests by utilizing a recognized form of quantification analysis. The Commission's determination arose from a sound and lawful analysis of the evidence presented. (See *City of Alton v. Commerce Comm'n* (1960), 19 Ill. 2d 76, 165 N.E.2d 513.) For these reasons we do not believe the Commission's conclusion in this area, including its decision not to include a separate disallowance for the category of time-related indirect costs, was arbitrary or capricious.

Also for these reasons, we reject the argument of the Attorney General that the proper rate-base disallowance is $409 million, the nominal difference the auditor found between the as-built plant and the reasonably built plant. In arguments before the Commission, the Joint Intervenors asserted that the proper disallowable amount was approximately $409 million, the amount by which the total as-built plant costs of $2.5 billion exceeded the auditor's calculation of an earlier completed plant of $2.1 billion. The Commission specifically rejected the Joint Intervenors' end-of-period AFUDC calculations, noting the auditor's finding that using the $409 million figure without adjustment unfairly gave the consumer a present-day plant at 1984 costs. The Commission's conclusion on the proper application of the AFUDC quantification method is affirmed.

■■■ We believe our determination of the quantification issue is also conclusive on the issues of the preoperational testing costs and nuclear steam supply system (NSSS) warranty extension costs associated with the 15.9 months of unreasonable delay. The Joint Intervenors argue that these costs, while properly disallowable, were not disallowed by the Commission. For the same reasons they argued above, the Joint Intervenors reject the Commission's rationale that these costs were included in the disallowance of delay costs. The auditor classified the preoperational testing and NSSS warranty costs as time-related indirect costs, a classification that Joint Intervenors do

not dispute. Because we accept the Commission's conclusions that time-related indirect costs have been subsumed in its calculation of delay costs, we likewise accept the Commission's finding that the preoperational testing and NSSS warranty costs have been accounted for in the rate-base disallowance.

## CIRCUIT COURT JURISDICTION

After the Illinois Supreme Court's decision in *Hartigan*, the circuit court of Cook County issued a jurisdictional statement on October 12, 1989, stating that through express provision in its May 16, 1986, stay order the circuit court retains continuing jurisdiction to administer the refund. According to the circuit court, its determination and administration of the refund supersedes the Commission's contrary refund methodology directives in the supplemental order on remand. The circuit court considers its continuing jurisdiction over the refund process to be judicially conferred and unrelated to the Public Utilities Act. In the jurisdictional statement, the circuit court pointed out that before it provided for one, there had been no provision for issuing a rate refund to consumers. The court also noted that the May 16 order was agreed to by the parties, none of which had appealed the order, and further, that the Illinois Supreme Court in *Hartigan* had considered the refund provision "allowable."

On appeal, the Commission acknowledges that the circuit court acted well within its authority as granted by Supreme Court Rule 305(b) (107 Ill. 2d R. 305(b)) in issuing the stay order of May 16, 1986. The Commission asserts, however, that once the supreme court issued its decision in *Hartigan*, remanding the case to the Commission, the appellate process concluded, and the jurisdiction of the circuit court expired.

The Joint Intervenors, IIEC, and the Attorney General argue that the circuit court has retained jurisdiction by virtue of the language of Rule 305(b)(3). (107 Ill. 2d R. 305(b)(3).) Under Rule 305(b)(3), the court is authorized to grant a stay "upon such terms as are just." The consumer and governmental intervenors assert that the refund and interest requirements mandated in the circuit court order are the "just" conditions of the stay order. The Intervenors maintain that the circuit court exercised an equitable power in fashioning the refund order and retains jurisdiction to implement the equitable provisions of the order. For support, the Intervenors cite to the case of *Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 510 N.E.2d 850, in which the Illinois Supreme Court ruled that it had the equitable power to provide for a refund remedy as one was not

provided for in the Public Utilities Act.

The Intervenors further argue that by virtue of the Illinois Supreme Court's reference in *Hartigan* to the circuit court's refund order, the supreme court affirmed the order and ensured its continued application after the remand. In *Hartigan*, the supreme court noted the circuit court's stay order permitting Edison to continue to collect rates subject to refund. (*Hartigan*, 117 Ill. 2d at 148, 510 N.E.2d at 877.) The supreme court thereafter stated that pursuant to its decision in *Independent Voters*, if the Commission on remand determined the October 1985 rate base to include costs that were unreasonable, refunds dating from the circuit court's reversal of the October 1985 rate order were "allowable." (*Hartigan*, 117 Ill. 2d at 148, 510 N.E.2d at 877.) The Intervenors further assert that the supreme court remanded only the rate-making process to the Commission, impliedly leaving the refund matter to the circuit court. The Intervenors emphasize that the parties agreed to the May 16, 1986, order. Finally, the Intervenors assert that the circuit court has continuing jurisdiction of the refund because it says it does.

We believe, as the Commission has argued, that the circuit court has no legal basis for continuing to exercise jurisdiction over the administration and determination of the refund. Supreme Court Rule 305 (107 Ill. 2d R. 305) provides specifically for the trial court to stay the enforcement of a judgment pending appeal. Once the appellate process has come to an end, in this case with the supreme court's decision in *Hartigan*, the authority granted under Rule 305 is terminated. Further, the "just terms" language of Rule 305(b)(3) does not affect our analysis. (107 Ill. 2d R. 305(b)(3).) Even were we to accept, which we do not, that the "just terms" language of Rule 305(b)(3) somehow confers equitable jurisdiction in the court, whatever jurisdiction the court had ceased upon completion of the appellate process.

■■■ We also do not believe that the supreme court's decision in *Hartigan* can be construed as tacit approval of the circuit court's continuing jurisdiction over the refund methodology. (See *City of Springfield v. Allphin* (1980), 82 Ill. 2d 571, 413 N.E.2d 394.) We believe, rather, that because the supreme court remanded the case to the Commission for further rate-making proceedings, it was unnecessary to comment upon the status of the circuit court's stay order. The possibility existed that the Commission would find no further disallowance in the rate base and therefore no necessity for a refund. The supreme court's finding that refunds dating from the circuit court's reversal are "allowable" is not an endorsement of the circuit court's assertion of jurisdiction to implement the refund, but rather an affir-

mation of the supreme court's creation of the refund remedy in *Independent Voters* (117 Ill. 2d 90, 510 N.E.2d 850). In the present case, the effect of the supreme court's ruling in *Hartigan* was to revest jurisdiction in the Commission. (See *Illinois State Chamber of Commerce v. Pollution Control Board* (1978), 67 Ill. App. 3d 839, 384 N.E.2d 922, *appeal dismissed* (1979), 78 Ill. 2d 1, 398 N.E.2d 9.) The circuit court has not retained, through Rule 305 or otherwise, continuing jurisdiction over the refund administration.

### REFUND METHODOLOGY ISSUES

Having found that the jurisdiction to implement the refund rests in the Commission, and not in the circuit court, we turn to address the terms of the Commission's supplemental order on remand. In doing so, we reject those of the Intervenors' arguments that are based on the proposition that the circuit court retains continuing jurisdiction over the refund methodology. The provisions of the circuit court of Cook County's May 16, 1986, stay order, governing the implementation of the refund, were significant only until the Illinois Supreme Court issued its opinion in *Hartigan*. We are not reviewing the directives of the circuit court, but rather those of the Commission.

### ACTUAL OR PROJECTED REVENUES

The Intervenors assert that the proper basis for calculating the refund amount is the actual revenue Edison has collected for the significant period. The alternative basis is Edison's revenue as projected by the Commission in its October 1985 rate order. In its supplemental order on remand the Commission notes its intention to address this issue on rehearing. However, a rehearing before the Commission never materialized, and the matter is presented to us on review. Under section 10—201 (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201), the consumer and governmental intervenors, by including the issue in their petition for rehearing, have effectively preserved the question for our review.

The position the Intervenors have taken is virtually unopposed by any of the parties. Edison does not contest the use of actual over projected revenues in calculating the refund. The Commission notes that it did not reach a formal conclusion on this issue. The Commission points out that in a special concurring opinion, three of the Commission members stated that were it put to a vote they would vote to require that the refund be based upon Edison's actual sales. The Commission further notes that the holding in *Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 510 N.E.2d 850,

does not expressly require that refunds be based on either projected or actual receipts. The Commission acknowledges that a persuasive argument may be made for the Intervenors' position.

The Commission urges, however, that if actual revenues form the basis of the refund, Edison is entitled to offset these receipts with any increase it has experienced in actual operating expenses. IIEC contests this argument. In IIEC's view, Edison's expenses have been accounted for either under the October 1985 rate order or in the Commission's sixth interim order, which went into effect January 1, 1989, and was overturned by the supreme court in *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192. IIEC maintains that any attempt to "fabricate" an actual expense level at this time constitutes retroactive rate making.

We do not believe that what the Commission is proposing is retroactive rate-making, but rather a matching of the relevant expenses to revenue for the period in question. In establishing rates, the Commission considers the revenue and expenses of the utility. Accordingly, a utility must file with the Commission rate data for a proposed test year. (*BPI v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192.) The test-year rule can be based on an historical, current, or future year, and is intended to match revenues to expenses. 83 Ill. Adm. Code §285.150 (1985).

In the present case, if Edison's actual expenses are found to be higher than actual receipts, the policy against retroactive rate-making prohibits Edison from surcharging its customers to make up the difference. We do not believe, however, that if actual revenues are to be used in calculating the appropriate refund amount, Edison should be prohibited from demonstrating an increase in expenses over that which was originally projected. Consistency of approach would seem to demand no less.

We believe the Commission is the proper forum to decide whether actual revenues should form the basis of the refund. In our view, there is no inhibition to such an approach. However, we do believe a consistency in accounting should be maintained. We remand to the Commission to enter an order consistent with our discussion of the issue.

### HISTORICAL OR CURRENT CUSTOMERS

The IIEC and the Attorney General argue that the equity of the situation demands that the refund be paid to historical customers, customers who actually overpaid utility rates. After its proceedings,

the Commission concluded that for reasons of economy and efficiency, the refund should be in the form of credit directed toward current utility customers. This conclusion was drawn in response to the Intervenors' concerns that refunds be made as promptly as possible, as well as Edison's testimony that refunds to historical customers would entail additional expense and delay. We believe that the Commission has responsibly considered the evidence presented on this issue and made a reasoned determination that is not against the manifest weight of the evidence.

## THE APPLICABLE RATE OF INTEREST

■■■ In its supplemental order on remand, the Commission concluded that the proper rate of interest to be applied to the refund is 5%. The Commission based this determination on the case of *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1987), 157 Ill. App. 3d 201, 510 N.E.2d 52, *appeal denied* (1987), 116 Ill. 2d 549, 515 N.E.2d 103, in which the court rejected the Commission's proposed interest rate of 10% and directed that a "legal rate" of 5% be applied. The Joint Intervenors, IIEC and the Attorney General assert that the proper rate of interest is at least the "fair and just" 9% rate prescribed by the circuit court of Cook County in its interest rate order. The interest rate order was issued pursuant to the circuit court's May 16, 1976, stay order, in which the court stated that interest would be calculated later, at a rate to be determined by the circuit court. We have determined that the circuit court's jurisdiction over the rate refund issue terminated upon the Illinois Supreme Court's decision in *Hartigan*. The circuit court's finding with regard to the proper rate of interest is therefore of no consequence.

The Intervenors argue, nonetheless, that the determination of the interest rate is governed by equitable principles, rather than statutory commands. For support, the Intervenors cite to the Illinois Supreme Court case of *In re Estate of Wernick* (1989), 127 Ill. 2d 61, 535 N.E.2d 876. *Estate of Wernick* is a probate case sounding in equity in which the supreme court found that a coparticipant in a land trust had breached his fiduciary duty through fraudulent conversion. In *Estate of Wernick*, the supreme court found that the 5% prejudgment interest rate mandated under the Interest Act (Ill. Rev. Stat. 1983, ch. 17, par. 6402) was insufficient to compensate the petitioner for money wrongfully withheld.

We believe that the decision in *Estate of Wernick* was based on the wrongdoing of the fiduciary, a circumstance that does not exist in the present case. Although Edison cannot benefit from those portions

of a rate increase that upon review are deemed unlawful, it is also under obligation to charge those rates set forth in Commission-approved schedules until the Commission sets new rates. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—240.) The court in *Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 510 N.E.2d 850, addressed this situation by providing that during the interval between reversal of a rate increase and the time a new rate schedule is approved, the utility may continue to charge the challenged rates, subject to refund. Because Edison is statutorily obligated to charge the rates prescribed by the Commission, we do not believe it can be considered accountable for wrongful conduct, as was the fiduciary in *Estate of Wernick*. Further, we believe as did the court in *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1987), 157 Ill. App. 3d 201, 510 N.E.2d 52, that equitable principles are not relevant where the Commission and the reviewing court's authority are purely statutory.

■■■ The Intervenors' next argument is that the circuit court's order of April 29, 1986, reversing the Commission's October 1985 rate order, was a final judgment, placing the present refund in the post-judgment rather than prejudgment context. According to the Intervenors, it therefore follows that the legal rate of interest is 9% as set forth in that section of the Code of Civil Procedure governing post-judgment interest. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1303.) We do not believe that the refund ordered in the present case can be considered an award of damages, and therefore, section 2—1303 of the Code is not a basis for imposing post-order interest. Contrary to the reasoning of the Intervenors, the refund order here under review has not been issued by the circuit court, but by the Commission, pursuant to the endorsement of the *Hartigan* court of the refund remedy authorized in *Independent Voters*. As the court stated in *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948, 525 N.E.2d 1053, *appeal denied* (1988), 122 Ill. 2d 570, 530 N.E.2d 239, the Commission has no general authority to fashion an award of damages and the fact that a payment of money is made necessary by the effect of the Commission's order is merely incidental to the Commission's action (citing *Ferndale Heights Utility Co. v. Illinois Commerce Comm'n* (1982), 112 Ill. App. 3d 175, 445 N.E.2d 334).

■■■ Edison argues that the present refund is a reparation for excessive rates. The Illinois Supreme Court in *Hartigan* referred to the refund as such. Under section 9—252 of the Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—252), reparations for excessive rates are to include interest at the legal rate. Edison maintains that

the legal rate of interest is 5%, as set forth for "settlement of accounts" in section 2 of the Illinois Interest Act (Ill. Rev. Stat. 1985, ch. 17, par. 6402).

Section 9—252 of the Public Utilities Act is the only provision in the Act that refers to an interest rate. (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—252.) We believe, as did the court in *Citizens Utilities*, that absent substantial evidence to the contrary, the reasonable rate of interest is "the legal rate" as prescribed in section 9—252. The court in *Citizens Utilities* found that the only reference to an interest rate in the Public Utilities Act is in section 9—252, wherein refunds for overcharges include interest "at the legal rate or at a rate prescribed by rule of the Commission"; and reparation for excessive or unjustly discriminatory amounts includes "interest at the legal rate." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—252.) The *Citizens Utilities* court found that the refund under scrutiny did not specifically fall under the categories of section 9—252, but nevertheless found the legal rate of 5% appropriate. (*Citizens Utilities Co.*, 157 Ill. App. 3d 201, 510 N.E.2d 52.) The court rejected the Commission's proposed 10% interest rate as unreasonable and unsupported by substantial evidence.

■■■ Like the *Citizens Utilities* court, we believe the proper rate of interest to be applied in this case is the legal rate prescribed in section 9—252 of the Public Utilities Act. Because Edison was obligated to charge the rates determined by the Commission until new rates were established, we do not believe the interest rate to be included in the refund remedy can reasonably exceed the maximum allowed for reparations for excess rates. We thus conclude that the Commission's imposition of a 5% interest rate is reasonable.

In conclusion, we reject the equitable principles argument of the Intervenors as we believe the Commission's authority to order a refund and set interest rates arises out of the Public Utilities Act. The Illinois Supreme Court in *Independent Voters* considered its authority to fashion a refund remedy to be pursuant to its authority to review Commission orders under section 10—201 (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—201) (formerly Ill. Rev. Stat. 1971, ch. 111²/₃, par. 72), of the Public Utilities Act. (*Independent Voters*, 117 Ill. 2d at 105, 510 N.E.2d at 857.) Similarly, the court in *Citizens Utilities* found that section 10—108 of the Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 10—108 (formerly Ill. Rev. Stat. 1979, ch. 111²/₃, par. 68)) provides the Commission's authority to charge interest. We believe the Commission's authority to impose an interest rate is, like its authority to order a refund, statutorily based. (See *Ferndale Heights Utility Co. v. Illinois Commerce Comm'n* (1982), 112 Ill. App. 3d 175,

445 N.E.2d 334.) Equitable principles, therefore, do not apply. We also believe for the reasons stated above that the interest rate at issue is not governed by the post-judgment interest statute. We believe that the appropriate interest rate is 5%, the legal rate as defined in section 2 of the Interest Act.

### SIMPLE OR COMPOUNDED INTEREST

The Commission concluded that interest on amounts to be refunded should be compounded on an annual basis. The Commission reasoned that compounded interest recognizes the time value of customer funds, a long-standing policy of the Commission. The Commission argues that rate refunds are not equivalent to judicial damage awards and are not to be treated as such. For support, the Commission refers to section 280.70 of the Commission's Rules governing customer deposits held by utilities. (83 Ill. Adm. Code §280.70(e)(2) (1985).) Under subsection (e)(2) of this rule, the accrued interest on a customer's deposit with a utility is refunded to the customer at the end of each year of service. According to the Commission, the effect of this procedure is to prevent the deposit from accruing only simple interest beyond a one-year period.

Edison counters that even under section 2—1303 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1303), the statute governing interest on post-judgment orders, only simple interest is allowed. In the absence of an agreement between the parties, Edison asserts, the law of Illinois does not favor compound interest. (*Harrington v. Kay* (1985), 136 Ill. App. 3d 561, 483 N.E.2d 560.) Edison further argues that section 2 of the Interest Act (Ill. Rev. Stat. 1985, ch. 17, par. 6402), the proper statute to look to for the legal rate of interest applicable under the Public Utilities Act, does not authorize compounding of interest. *Ade v. Ade* (1913), 181 Ill. App. 577; *Taylor v. Scott, Foresman & Co.* (1913), 178 Ill. App. 487.

■■ We agree with the Commerce Commission that rate refunds are not equivalent to judicial damage awards. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948, 525 N.E.2d 1053, *appeal denied* (1988), 122 Ill. 2d 570, 530 N.E.2d 239.) We believe, as the Commission has determined, that a rate refund can be treated as the equivalent of a customer deposit on hold with a utility. A customer deposit, by its nature, is intended from the moment it is collected to be returned to the customer. Similarly, a refund is allocated to the customer from the moment a portion of the utility rate is found to be illegal.

### 1989 REFUND CALCULATION

The Intervenors assert that we should direct Edison to implement the refund for the period April 29, 1986, through December 31, 1988, effective immediately after this court determines the issues raised here on appeal. Edison does not contest this argument. Edison admits that a refund amount for the period April 1986 through December 1988 is determinable because the proper rates for this period can be calculated by subcontracting from the October 1985 rate determination the construction costs the Commission determined on remand to be unreasonable. Edison contends, however, that the refunds effective for 1989 cannot at this time be made because the sixth interim order setting the 1989 rates was overturned by the Illinois Supreme Court in *BPI v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192. It is Edison's contention that until the proper rates for 1989 are determined, there is no way of calculating the refund for that period.

Neither IIEC nor the Attorney General contests Edison's argument that the refunds for 1989 are not yet subject to determination. However, the Joint Intervenors argue that despite the reversal of the sixth interim order in *BPI v. Illinois Commerce Comm'n*, the rate increase for 1989 can only be lower or equal to the $235 million rate increase the Commission approved in the sixth interim order. Consequently, according to the Joint Intervenors, the refund amount can only increase or remain the same. The Joint Intervenors maintain that to find otherwise would be an endorsement of retroactive rate-making. The Joint Intervenors maintain that if it is appropriate, once the Commission on remand from the supreme court's decision in *BPI* determines the proper 1989 rates, an additional refund for 1989 can be ordered.

As the Joint Intervenors admit, the Illinois Supreme Court in *BPI v. Illinois Commerce Comm'n* made no determination as to whether the rates the Commission will promulgate on remand must necessarily be higher or lower than those determined in the sixth interim order. In *BPI*, the supreme court found that a settlement agreement the Commission entered into with Edison, which included a rate order for the year 1989, was improper. On remand, the Commission was instructed to make a proper rate determination, consistent with the evidence and the record, and the rights of all parties involved. On remand, the Commission is not engaging in original, or retroactive rate-making, but rather attempting again to set proper 1989 rates, this time in accordance with the supreme court's instruction. The Commission may determine that an increase of more than $235 million is in order. While Edison is prohibited from collecting more reve-

nues from ratepayers than it has for 1989, a higher rate base will conceivably reduce the refund amount.

In *BPI* the court ordered Edison, based on an amendment Edison had agreed to in the sixth interim order, to refund those amounts collected under the 1989 increase. The supreme court noted that the amendment contrasted with Edison's duty under common law. Under common law, as the supreme court has stated in *Independent Voters v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 510 N.E.2d 850, refunds should be comprised of the difference between the original rates and the rates that would have been charged if rates had been correctly set. In light of this rule, we do not believe that the refund for 1989, based on the Commission's remand order, can be accurately determined until the Commission establishes the proper rates for that year. Accordingly, we direct Edison to promptly implement upon the Commission's resolution of the remand issues ordered in this opinion, the refund for the period April 29, 1986, through December 1988. The refund for 1989 awaits the Commission's determination of the proper rates for those periods.

In summary, we affirm the Commission's rulings with respect to its findings of unreasonable delay and activity in the construction of Byron I. We also affirm the Commission's approach to the application of the AFUDC method of quantifying delay costs. We reject the assertion that the circuit court has retained jurisdiction over the refund process. We uphold the Commission's rulings with respect to the refund methodology issues, including the Commission's determination that the proper rate of interest is 5% compounded annually. We remand to the Commission, in accordance with our discussion of it, the issue of whether the refund should be based on Edison's actual or projected revenues. Finally, we reverse that portion of the Commission's remand orders calling for Edison to refund at this time that portion of the refund due under revenues collected in 1989.

Affirmed in part; reversed in part and remanded in part.

JOHNSON and LINN, JJ., concur.